IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

MARIA ISABEL PERALES SERNA, ET AL.,   §
                                       §
          Plaintiffs,                  §
                                       §
V.                                     §        1-15-CV-446  RP
                                       §
TEXAS DEPARTMENT OF STATE              §
HEALTH SERVICES, VITAL STATISTICS      §
UNIT, ET AL.,                          §
                                       §
          Defendants.                  §

## ORDER

Before the Court are Plaintiffs' Emergency Application for Temporary Injunction, filed August 21, 2015 (Clerk's Dkt. #25), the responsive pleadings thereto, as well as Amicus briefs filed both in support of, and opposition to, Plaintiffs' application. The Court conducted a hearing on the application on October 2, 2015. Having considered the application, response, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' application for a preliminary injunction should be denied. *See* FED. R. CIV. P. 65(b).

### I.  BACKGROUND

Plaintiffs in this action are La Union del Pueblo Entero, Inc. ("LUPE"), which describes itself as a non-profit organization dedicated to promoting the health, education, labor, and civil rights of indigent farmworkers and other low-wage workers in the Rio Grande Valley, and undocumented person Maria Isabel Perales Serna, and other similarly situated parents, who bring this action on behalf of themselves and minor children. Plaintiffs assert claims against defendants the Texas Department of State Health Services, Vital Statistics Unit ("DSHS"), as well as DSHS Commissioner Kirk Cole and Unit Chief Geraldine Harris in their official capacities challenging recent policy changes adopted by DSHS.

At issue in this case is the claim by Plaintiffs that persons without legal immigration status in the United States are effectively denied the ability to obtain a birth certificate for children born in Texas, who are thus citizens of the United States.  Plaintiffs contend the effective bar creates numerous issues in obtaining the rights and benefits which inure to citizens of the United States, including enrollment in schools and social welfare programs, as well as other services such as baptism and day care services.  They maintain access to those benefits, services and programs is contingent on presentation of a birth certificate, and thus the inability to obtain a birth certificate effectively denies access to children born in Texas to persons without legal immigration status.

DSHS is the Texas state agency statutorily empowered to "administer the registration of vital statistics."  TEX. HEALTH & SAFETY CODE ANN. § 191.002(a).  Subject to DSHS rules, the state registrar is required to "supply to a properly qualified applicant, on request, a certified copy of a record, or part of a record, of a birth" registered with DSHS.  *Id.* § 191.051(a).  A "properly qualified applicant" is defined as:

> The registrant, or immediate family member either by blood, marriage or adoption, his or her guardian, or his or her legal agent or representative. Local, state and federal law enforcement or governmental agencies and other persons may be designated as properly qualified applicants by demonstrating a direct and tangible interest in the record when the information in the record is necessary to implement a statutory provision or to protect a personal legal property right.

25 TEX. ADMIN. CODE § 181.1(21).  The governing regulation ("Section 181") also mandates, to meet the requirement that an applicant requesting a record be "properly qualified," the applicant "must  present proof of identity acceptable to the State Registrar."  *Id.* § 181.28(i)(2).[1]

Section 181 sets forth an extensive list of acceptable forms of identification divided into three categories – primary, secondary and supporting.  Primary identification documents are a variety of documents issued by the federal or state governments, including a driver's license,

---

[1]  Prior to 2013, the forms of acceptable identification were contained not in the Texas Administrative Code, but in the Vital Statistics Unit's Local Registrar Handbook.  (Def. Resp. Decl. of Farinelli ¶ 7).

2

military id, passport and permanent resident card.  The documents must be current and valid.  *Id.*

§ 181.28(i)(10).  Section 181 lists the following acceptable forms of secondary identification:

> (I) Current student identification;
> (ii) Any Primary Identification that is expired;
> (iii) Signed Social Security card, or Numident;
> (iv) DD Form 214 Certificate of Release;
> (v) Medicaid card;
> (vi) Medicare card;
> (vii) Veterans Affairs card;
> (viii) Medical insurance card;
> (ix) Foreign Passport accompanied by a Visa issued by the United States Department of State;
> (x) Foreign Passport in accordance with the United States Department of State, Visa Waiver Program;
> (xi) Certified birth certificate from the Department of State (FS-240, DS-1350 or FS-545);
> (xii) Private Company Employment Identification card;
> (xiii) Form I-94 - accompanied by the applicant's Visa or Passport;
> (xiv) Mexican voter registration card; or
> (xv) Foreign Identification with identifiable photo of applicant.

*Id.* § 181.28(i)(11)(D).  Supporting identification is described simply as "[o]ther records or documents that verify the applicant's identity" and directs "examining or supervisory personnel" to consult DSHS policies to determine whether the supporting identification document is acceptable. *Id.* § 181.28(i)(12).[2]

A single primary identification document is sufficient to establish identity.  *Id.* § 181.28(i)(10).  Absent primary identification, to satisfy the identification requirement, an applicant must submit two forms of secondary identification of different types, or one form of secondary identification and two forms of acceptable supporting identification of different types.  *Id.* § 181.28(i)(11)(B).

Persons without legal immigration status almost universally lack any primary identification

---

[2]  The DSHS Local Registrar Handbook, revised in April 2015, provides examples including recent utility bill, school transcripts, bank account statements, foreign birth certificates and marriage licenses.  (Def. Supp. Decl. of Kerr Ex. 5-1 at 43).

documents.  Plaintiffs allege many persons without legal immigration status do not have foreign identity documents which would qualify as secondary identification for a variety of reasons.  For example, many left their native country as minors, and thus never obtained a drivers' license or electoral identity card.  They further allege many such persons were stripped of, or have lost, identification cards during their journey to the United States.  (2nd Am. Compl ¶ 48-53).

According to Plaintiffs, for a number of years, registrars accepted official photo identification cards, issued by a local consulate, as satisfying the identification requirement for a "properly qualified applicant."[3]  (*Id*. ¶ 56).  Plaintiffs describe the consular identification documents as official photo identification cards provided by the foreign government, by way of its consulate, to its citizens residing in the United States. The documents can be obtained by presentation of proof of citizenship and identity to the consulate.  (*Id*. ¶ 57).

Plaintiffs allege Defendants began rejecting Mexican matriculas as a policy change a few years ago.  They contend the change in policy was only sporadically enforced until approximately 2013, when it began to be ever more strictly enforced.   According to Plaintiffs, consular identification from other nations is now rejected as well.  (*Id*. ¶¶ 58-59).

Plaintiffs assert six causes of action.  By way of the first four, they contend the rights of the Plaintiff children and Plaintiff parents to equal protection and due process are being denied as a result of Defendants' interpretation and enforcement of Section 181 which effectively denies the issuance of birth certificates for the Plaintiff children.  (*Id*. ¶¶ 124-90).  By way of the fifth, Plaintiffs contend Defendants' interpretation and enforcement of Section 181 violates the Supremacy Clause because matters of immigration policy are the exclusive function of the federal government.  (*Id*. ¶¶ 191-205).  By way of the sixth, they contend the Defendants' change in policy regarding interpretation and enforcement of Section 181 constitutes a de facto change to

_____

[3]  The Mexican version of the consular identification document is known as the "matricula."

4

published regulations without benefit of any of the procedures required under Texas' Administrative Procedures Act and thus the de facto regulations are void under state law. (*Id*. ¶¶ 206-18).

Plaintiffs now seek a preliminary injunction requiring Defendants to "determine at least two forms of identification [that are] reasonably and actually accessible to undocumented immigrant parents of Texas-born children" that satisfy the identification requirement for a properly qualified applicant to obtain the birth certificate of a child born in Texas. The parties have filed responsive pleadings and supporting affidavit testimony. The Court conducted a hearing on October 2, 2015 and the matter is now ripe for review.

## II.  STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir. 1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co.,* 760 F.2d 618, 621 (5th Cir. 1985).

## III.  ANALYSIS

### A.  Substantial Threat of Irreparable Injury

In seeking a preliminary injunction Plaintiffs contend they face irreparable injury as a result

5

of Defendants' conduct.  Plaintiffs in this action fall into three categories.  One, the non-profit organization LUPE.  Two, the "Plaintiff parents" who are parents to Texas born children.  And, three, the "Plaintiff children" who were born in Texas to undocumented parents.  Based on the focus of the arguments raised at the hearing, the Court will turn to the third category first.[4]

Plaintiffs maintain the inability to obtain birth certificates for children born in Texas deprives the Plaintiff children of the rights and benefits to which they are entitled as United States citizens.  The Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) ("loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction.").  Our sister court has extended that conclusion, pointing out that "[f]ederal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law.  *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015).  *See also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").  Noting that "[a]n injury is irreparable if money damages cannot compensate for the harm," our sister court found allegations of infringement on due process and equal protection rights resulting from enforcement of a state law prohibiting their marriage constituted an irreparable injury.  *De Leon*, 975 F. Supp. 2d at 663. The Court thus concludes Plaintiffs need only show a deprivation of a constitutional right to establish the requisite irreparable injury.

---

[4]  Plaintiffs did not address LUPE's interest in, or suggest it faced irreparable injury without, the grant of a preliminary injunction either in their briefs or during the hearing.  Accordingly, the Court will not address LUPE any further herein.

Plaintiffs argue the conduct of Defendants has interfered with the fundamental rights of citizenship, to travel and to familial integrity, as well as education and public benefits. By way of affidavit testimony, Plaintiffs detail a list of harms facing families unable to obtain birth certificates for their Texas born child.  Specifically, they present evidence that because Plaintiff parents possessed only consular identification cards they were unable to obtain birth certificates for Texas born children and: (1) Plaintiff Cedillo Nieto was unable to bring her son back into the United States after traveling to Mexico (Plf. App. Aff. of Cedillo Nieto); (2) are unable to baptize their children (*Id*. Aff. of Garcia; Aff. of Gomez Ibarra); (3) have difficulties retaining Medicaid assistance for children facing serious health issues (*Id*. Aff. of Garcia; Aff. of Ibarra; Aff. of Perales Serna); (4) enrollment in school or day care may be terminated or refused (*Id*. Aff. of Garcia; Aff. of Gomez Ibarra; Aff. of Perez; Aff. of Teran Uriegas; Aff. of Garza); (5) cannot complete an application for or retain Section 8 housing assistance (*Id*. Aff. of Garcia; Aff. of Vega); (6) face difficulties at immigration checkpoints when officers threaten to detain a child without proof of citizenship or relation to the Plaintiff parent (*Id*. Aff. of Gomez Ibarra; Aff. of Perales Serna); and (7) face difficulties obtaining and retaining Social Security Disability benefits for their children (*Id*. Aff. of Garza).

Defendants respond by contending that the lack of a birth certificate does not prevent a Texas born child from attending school or qualifying for Medicaid.  They point to a provision of the governing statute which permits the state registrar to issue to a parent "a certificate necessary for admission to school" which is "limited to a statement of the child's birth."  TEX. HEALTH & SAFETY CODE ANN. § 191.0046(a).  According to Defendants, identification is not required in order to obtain this certificate.  (Def. Resp. Decl. of Farinelli ¶ 8).  Further, the Texas Health and Human Services Commission ("HHSC"), which administers the Medicaid program, has a gateway to the Vital Statistics Unit and can verify birth records.  Thus, parents need not have a birth certificate

for a child born in Texas to obtain Medicaid.  (*Id*. ¶ 8; Decl. of Muth ¶ 8).  Defendants also suggest Plaintiffs have not satisfied their burden to show irreparable injury because they have not presented affidavit testimony from each named Plaintiff parent which contains sufficient facts to establish the need for a birth certificate to obtain the benefits and privileges of citizenship.[5]

The Court finds Defendants' response inadequate for a number of reasons.  First, Defendants have addressed only two of the seven harms Plaintiffs assert they face as a result of the inability to obtain birth certificates for Texas born children.  Second, Defendants themselves have presented supplemental evidence which establishes that, for a student under eleven years of age being enrolled in a school for the first time, the person enrolling a child born in the United States must provided a certified copy of the child's birth certificate within thirty days.  (Def. Supp. Aff of Marx Ex. 5-1 at  49).  If the person is unable to produce a certified copy of the birth certificate, other identification may be acceptable, but must be accompanied by a "signed note explaining why the person was unable to produce a certified copy of the birth certificate."  (*Id*.).  In the case of an undocumented person, this signed note would admit their status and thus expose them to potential criminal liability and removal from the United States.[6]

Third, Plaintiffs, in their reply, present evidence from two witnesses who called a number of Medicaid offices in Texas and were told by many that they had no ability to verify birth absent a birth certificate.  (Plf. Reply Aff. of Anway; Aff. of Dabaghi).  Plaintiffs also present affidavit testimony that Plaintiff parents have been specifically told by personnel at Medicaid offices that

---

[5]  Defendants also suggest, because Plaintiff Cedillo Nieto admits she was able to obtain a birth certificate for her son, she has failed to establish irreparable injury.  But they do not contest it took some months to obtain the birth certificate, and that her son was in dangerous circumstances in Mexico during that period.  (Plf. Reply Aff. of Cedillo Nieto).  As noted above, even a brief deprivation of a constitutional right, such as the right of citizenship and to travel, is sufficient to establish injury.

[6]  An August 11, 2015 informational letter sent by the Texas Education Agency to school administrators specifically directs that, if the person enrolling a child does not provide the required information, "the school shall notify the appropriate law enforcement agency before the 31st day after the person fails to comply."  (Def. Supp. Aff. of Marx Ex. 6-2 at 19).

a birth certificate must be presented to renew Medicaid.[7]  (*Id*. Aff. of Barragan Gutierrez).

Fourth, Plaintiffs present additional affidavit testimony detailing personal experiences of the difficulties faced in obtaining birth certificates and the attendant benefits thereof.  Specifically, Plaintiffs provide evidence that one or more of them has been informed by workers at the pertinent offices that: (1) a birth certificate is required to obtain WIC benefits (*Id*. Aff. of Barragan Gutierrez); (2) a birth certificate is required to obtain Section 8 housing benefits (*Id*. Aff. of Garza; Aff. of Garcia Castro); (3) the Catholic Church requires a birth certificate for baptism (*Id*. Aff. of Garcia Castro; Aff. of Gomez Ibarra); (4) a birth certificate is a requirement to obtain Medicaid (*Id*. Aff. of Garcia Castro); (5) a birth certificate is required to attend public school (*Id*. Aff. of Garcia Castro);[8] and (6) a birth certificate is required to enroll in Head Start (*Id*. Aff. of Gomez Ibarra).

Finally, it simply begs credulity for Defendants to argue a birth certificate is not a vitally important document.  The rights and privileges of citizenship inure to those who are citizens.  The lack of a birth certificate, or other documentation establishing citizenship, presents a clear bar to access to those rights.

Based on the evidence presented by Plaintiffs, the Court concludes Plaintiffs have established, at a minimum, that deprivation of a birth certificate to the Plaintiff children results in deprivations of the rights and benefits which inure to them as citizens, as well as deprivations of their right to free exercise of religion by way of baptism, and their right to travel.

The question of whether the Plaintiff parents have met the requisite burden at this stage of the litigation is a closer one.  The sole argument Plaintiffs offer in their pleadings is that the

---

[7]  When a child is born, the hospital will report the birth to DSHS, issue a Verification of Birth letter to the parent, and make arrangements for a Social Security card and the first year of Medicaid coverage.  (Plf. Reply Aff. of Gonzalez).

[8]  Plaintiffs also present affidavit testimony that in response to phone calls to five individual public schools, as well as one school district, the caller was consistently told a birth certificate was required for attendance.  (Plf. Reply Aff. of Martinez).

Plaintiff parents are deprived of their fundamental right to raise and protect their children absent the issuance of a birth certificate.

The right to family integrity is clearly protected by the Constitution. *See Moore v. City of E. Cleveland*, 431 U.S. 494, 503-05 (1977) (discussing source and extent of constitutional protection of the sanctity of the family); *Kipps v. Caillier*, 205 F.3d 203, 206 (5th Cir. 2000) ("parent-child relationship lies at the heart of protected familial associations"); *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999) ("The constitutional right to family integrity was well established in 1992"). This right is held by both the child and the parents. *Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000).   However, as Defendants point out, the Fifth Circuit has repeatedly characterized the right as ill-defined.  *See, e.g., Doop v. Chapman*, 211 F. App'x 246, 248 (5th Cir. 2006) (noting court has not "clearly defined the nebulous right to family integrity in this context"); *Rolen v. City of Brownfield*, 182 F. App'x 362, 364 (5th Cir. 2006) (referring to "due process right of family integrity" as "nebulous and undefined"); *Peters v. Lowrey*, 114 F.3d 1184 (5th Cir. 1997) (although right to family integrity has been recognized, contours of the right are "nebulous and not clearly established"); *Kiser v. Garrett*, 67 F.3d 1166, 1172 (5th Cir. 1995) ("nebulous, ill-defined right to family integrity"); *Doe v. Louisiana*, 2 F.3d 1412, 1417 (5th Cir. 1993) (prior cases have noted ""nebulous nature" of right of family integrity); *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988) (referring to "nebulous right of family integrity").

Although the right to family integrity may be nebulous, the Court concludes its parameters extend to issue of food, shelter, medical care and religious participation by a parent on behalf of his or her child.  In this case, Plaintiffs have presented evidence that the lack of a birth certificate for a Texas-born child presents grave difficulties to a parent seeking to obtain public assistance in providing that child food, shelter and medical care.  In addition, Plaintiffs have presented evidence that the lack of a birth certificate makes it impossible for at least some parents to have

a child baptized.

The Court thus finds Plaintiffs have sufficiently shown a substantial threat of irreparable injury to the Plaintiff children and parents to meet the first element necessary to obtain a preliminary injunction.

## B.  Likelihood of Success

Plaintiffs contend they are likely to succeed on the merits of their equal protection and due process claims, as well as their claim based on federal preemption.[9]   To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."  *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).  *See also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")).

### 1.  Equal Protection and Due Process

#### a.  Guiding Principles

Under the Due Process Clause of the Fourteenth Amendment no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.  The fundamental liberties protected by this Clause include both the rights enumerated in the Bill of Rights, as well as personal choices central to individual dignity and autonomy, including "intimate choices that define personal identity and beliefs."  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015).  *See also Simi Inv. Co. v. Harris Cnty.*, 236 F.3d 240, 249 (5th Cir. 2000) (violation of

---

[9]  As set forth above, Plaintiffs also assert a claim for violation of the Texas Administrative Procedures Act in their complaint.  They have not, however, addressed that claim in moving for a preliminary injunction.  The Court thus declines to address that claim at this stage of the proceedings.

substantive due process occurs when the government "works a deprivation of a constitutionally protected interest"). The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. The basis of an equal protection claim is, thus, the requirement that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1989); *Plyler v. Doe,* 457 U.S. 202, 216 (1982); *Piotrowski v. City of Houston,* 237 F.3d 567, 578 n.15 (5th Cir. 2001).

In analyzing an equal protection challenge strict scrutiny is appropriate "only where a government classification implicates a suspect class or a fundamental right." *Rublee v. Fleming*, 160 F.3d 213, 217 (5th Cir. 1998). *See City of Cleburne*, 473 U.S. at 440 ("when a statute classifies by race, alienage, or national origin" law is subjected to strict scrutiny). Otherwise, equal protection analysis requires only "that the classification be rationally related to a legitimate state interest." *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009). Similarly, in a due process challenge, "I[if] the right is so deeply rooted—if it is fundamental—we subject it to more exacting standards of review. If it is not, we review only for a rational basis." *Cantu-Delgadillo v. Holder*, 584 F.3d 682, 687 (5th Cir. 2009) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

### b. Appropriate Level of Scrutiny

Although Defendants maintain there is no fundamental right at issue, the Court has concluded the Plaintiffs have presented evidence showing that a lack of a birth certificate affects the fundamental rights of the citizen Plaintiff children and the fundamental right of family integrity for both the Plaintiff children and parents. Insofar as a birth certificate is the primary means of documenting citizenship, it follows that a citizen's right to obtain it is as fundamental as the rights and privileges that flow from the status it documents. Accordingly, a heightened level of scrutiny

is appropriate in analyzing the constitutional claims presented in this case.  *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 547 (1983) ("Statutes are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech...."); *Merced v. Kasson*, 577 F.3d 578, 587 n.12 (5th Cir. 2009) (noting even neutral laws of general applicability must still pass strict scrutiny if more than one constitutional right is implicated, citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (combining the right to free exercise of religion with parents' fundamental right to raise their children as they choose)).[10]

Under strict scrutiny, the challenged law must be narrowly tailored to be the least restrictive means of achieving a compelling government interest.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).  A law is narrowly tailored if it "actually advances the state's interest ..., does not sweep too broadly ..., does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of [a constitutional right] (is the least-restrictive alternative)."  *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) (quoting *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc)).  A policy is underinclusive if it is too narrow in scope to reasonably fulfill the government's purported interest.  *See id.*  Such a policy fails strict scrutiny because its underinclusiveness raises the possibility that the government's stated interest is pretextual and that the policy is actually intended to serve another end.  *See Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2740 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes"); *Tex. Lottery Comm'n*, 760 F.3d at 440 ("Such obvious underinclusiveness undermines any argument that Texas is truly interested in

---

[10]   The Court notes the Fifth Circuit has applied a heightened level of scrutiny to challenges to statutes imposing additional burdens on citizens in immigration related matters.  *See Nguyen v. INS*, 208 F.3d 528, 534–35 (5th Cir. 2000), *aff'd*, 533 U.S. 53 (2001).

regulating gambling.").

### c. Application of Strict Scrutiny

Plaintiffs first suggest Defendants have not proffered any state interest which rises to the level of compelling.  Although Defendants disagree that strict scrutiny applies to this case, they have pointed out that a certified copy of a birth record can be used to obtain numerous identification documents, such as a passport or driver's license, as well as to commit identity theft. (Def. Resp. Decl. of Farinelli ¶ 3).  Accordingly, in Texas, birth certificates are not treated as open records.  TEX. GOV'T CODE ANN. § 552.115 (excepting birth certificates from requirements of Texas Open Records Act).  In further recognition of the importance of protection of a birth certificate, it is a felony offense in Texas to fraudulently use or possess identifying information of another person, specifically including the "identifying information of a child younger than 18 years of age." TEX. PENAL CODE ANN. § 32.51(b)(3).[11]  Accordingly, the Court concludes Plaintiffs have not shown Texas lacks a compelling interest in protecting the issuance of birth certificates.  *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (party seeking injunction carries the burden of persuasion on all four requirements).

The remaining issue is whether Section 181 is narrowly tailored to be the least restrictive means of vindicating Plaintiffs' constitutional rights.  Of particular significance in this case is that the determination of likelihood of success is not solely a question of law, but rather a mixed question of law and fact.  *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).  The threshold factual question is whether Plaintiffs have established Section 181 prevents the issuance of a birth certificate for the Plaintiff children.  "Consequently, to establish a substantial likelihood of success on the merits, [Plaintiffs] must demonstrate that [Section 181], as applied against [Plaintiffs] in this

---

[11]  The Court notes any argument Plaintiffs assert which downplays Texas' interest in protecting possession of a birth certificate is strongly rebutted by their testimony regarding the importance of that document.

case on these facts, likely violates the Constitution." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 453 (5th Cir. 2014).

As a preliminary matter, the Court notes the record in this case has been an evolving one. At the outset, Plaintiffs presented a broad sweeping narrative which suggested an entire class of persons was being deprived, as a matter of law, from obtaining a birth certificate. As the record developed, the evidence became something of a moving target, and unfortunately less clear. Specifically, it is particularly troubling that the affidavits of the Plaintiff parents lack precision in detailing which forms of identification they, or other qualified applicants, actually possess or can reasonably obtain. Nonetheless, following a detailed and thorough analysis of Plaintiffs' evidence, the Court finds the affidavit testimony establishes there are two sets of Plaintiff parents.[12]

The first set consists of those Plaintiffs whose testimony establishes they either personally have, or another "qualified applicant" has, sufficient identification documents for a birth certificate to issue to the related Plaintiff child. For example, Plaintiffs present testimony from Quenia Perez in which she states her child's paternal grandmother possesses a Mexican passport without visa, and a valid Mexican electoral card, and further that she has been advised by the "birth certificate office" that those documents satisfy Section 181. (Plf. Add'l Aff. Aff. of Perez). Nancy Garcia Castro states her husband has a current Mexican driver's license and expired Mexican electoral card, which would satisfy Section 181. (Plf. Reply Aff. of Garcia Castro).

As to this first set of Plaintiff parents, while the Plaintiff parents indicate they have not been able to obtain birth certificates,[13] Defendants maintain the evidence presented does not point to

---

[12] The evidence, as well as statements during the hearing, establish that there is a third, unique, Plaintiff parent who has been able to obtain a birth certificate for her Texas-born child since the filing of this lawsuit. The claims raised on behalf of her and her child thus need not be addressed in ruling on Plaintiffs' application for preliminary injunction.

[13] Some Plaintiff parents' affidavit testimony indicates they have been denied birth certificates for their respective children even though the documents presented satisfy Section 181. If true, this conduct could support a cause of action against individual DSHS employees. It does not, however, suffice to support their attack on Section

any inadequacy in Section 181 as the cause.[14]  The language of Section 181 clearly supports that position, and Plaintiffs do not argue otherwise.  Accordingly, as to this first set of Plaintiff parents, there is not a sufficient showing demonstrating that Section 181, as applied to them in this case on these facts, likely violates the Constitution.

The other set of Plaintiff parents have submitted affidavits in which each states she has attempted to obtain a birth certificate by presenting documents which do not satisfy the requirements of Section 181 and was turned down.  These parents state they presented documents, including consular identification or a foreign passport without a visa, which would have, or actually had, previously sufficed to establish identity sufficient to obtain a birth certificate for their child.[15]

As set forth above, under Section 181 a foreign passport may be used as a secondary form of identification only if it includes a visa, or is issued by a "Visa Waiver" country.  25 TEX. ADMIN. CODE § 181.28(i)(11)(D)(ix-x).  Section 181 accepts as a form of secondary identification any "Foreign Identification with identifiable photo of applicant.  *Id*. § 181.28(i)(11)(D)(xv).  However,  the Vital Statistics Unit's Local Registrar Handbook specifically states DSHS "does not accept the Matricula Consular as an independent form of valid identification."  (Def. Resp. Supp.

---

181.  As noted above, counsel for Defendants acknowledged during the hearing on this application that the filing of this lawsuit directly led to the issuance of a birth certificate for one Plaintiff child.  The Court urges counsel for both parties to review the testimony and documents presented with the application for preliminary injunction and responsive pleadings to determine whether other Plaintiffs are eligible for issuance of a birth certificate for their child.

[14]  The Court additionally notes Plaintiffs have provided testimony which suggests a troubling practice by certain employees at local registrar offices.  Specifically, Plaintiffs have presented testimony  that: (1) the registrar's office told one plaintiff she could get in trouble requesting a birth certificate for a United States citizen and threatened to call immigration (Plf. Reply Aff. of Barragan Gutierrez); and (2) that, during the first week of September 2015, a plaintiff went to the HHSC office in Austin to obtain her daughter's birth certificate but when she informed an employee she was not a United States citizen or resident, was told by the employee that birth certificates for children of immigrants would not be processed as the children are considered immigrants, and was removed from the waiting line. (*Id*. Aff. of Rodriguez Bonilla).  These allegations, however, also do not support a challenge to Section 181, but rather possibly to the practices of specific employees of DSHS.

[15]  A number of the Plaintiff parents have other, older, Texas-born children for whom they were able to obtain birth certificates.

Ex. B at  43).  Based on the clear language of Section 181 and the Local Registrar Handbook, the Court concludes the second set of Plaintiff parents have sufficiently shown that application of Section 181 to them has actually resulted in a deprivation of a fundamental right.  The Court, therefore, turns to the second portion of the strict scrutiny analysis. That is, whether the law is sufficiently narrowly tailored to be the least restrictive means of achieving a compelling government interest.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

Defendants contend the current requirements were adopted due to concerns regarding identity theft and the reliability of identification documents.  While this explanation is facially reasonable, it is worth noting that counsel for Defendants admitted at the hearing on the preliminary injunction that no evidence, statistical or otherwise, was presented by Defendants establishing that those concerns were not being adequately addressed prior to the implementation of Section 181.  Nonetheless, Defendants have presented evidence which they maintain shows DSHS was concerned with, and attempted to address, a real potential for fraud in implementing Section 181.

Specifically, in 2008 DSHS was contacted by the Consul General of Mexico who inquired whether consular identification, specifically the Mexican matricula, was no longer acceptable. (Def. Resp. Decl. of Connelly ¶ 3).  According to Defendants, research undertaken by DSHS "revealed that matriculas are issued by individual Mexican Consulates in the United States, and that the Consulates do not maintain a centralized database that keeps track of persons who have been issued a matricula and which consular office issued the person a matricula."  (*Id*. Decl. of Harris ¶ 3).  Additionally, the research revealed that Mexican Consulates did not verify the authenticity of the documents presented by persons seeking a matricula, and that registrars in only four of twenty states responding to DSHS' inquiry accepted the matricula as stand-alone identification.  (*Id*.).  Further, when conducting its research, DSHS learned of, and apparently

relied heavily on, "extensive research" which had already been performed by the United States Government.  (Def. Resp. Decl. of Connelly ¶ 4).  Specifically noted is testimony provided to Congress by the FBI that neither the FBI nor the Department of Justice recognized the matricula as a valid form of identification, nor did United States Immigration and Custom Enforcement.  (*Id*.).  DSHS informed the Consul General by letter dated June 20, 2008 that the matricula would no longer be accepted as an independent verification of identity.  (*Id*. ¶ 8).

Further, according to Defendants, a foreign passport, even if authentic, does not necessarily indicate that the foreign government verified the authenticity of the source documents used to obtain the passport.  (*Id*. Decl. of Farinelli ¶ 6).  In addition, if a copy of a passport is mailed in, rather than directly presented at a DSHS' office, there is no opportunity to examine the passport for the presence of certain security features.  (*Id*.).  According to Defendants, these concerns are mitigated through the visa process, because if a visa was issued, the State Department conducted inquiries that would confirm the identity of the passport holder.  And, in the case of a visa waiver, the State Department has determined that there is minimal risk from accepting the passport without any further investigation into the holder of the passport.  (*Id*.).

Plaintiffs, in turn, argue Defendants' research and conclusions are outdated.  In support of this assertion, they provided the affidavit of the Consul General of the United Mexican States ("Mexico") located in Austin, Texas.  (Plf. Reply Aff. of Gonzalez Gutierrez).  The affidavit testimony establishes that, in 2006, Mexico improved the security features of the consular identification card by beginning "operation of a centralized database including biometrics, decoded information of the bearer using bi-dimensional code bars and other methods used according to international standards."  (*Id*. ¶ 14).  Further, in November 2014, Mexican consulates across the United States started issuing a new version of the consular identification card, which has additional security measures including biometrics of the applicant with embedded identity data,

upgraded design features of the card itself, and a photograph that is clearer than on past versions. (*Id*. ¶¶ 16, 21-27).

In addition, Plaintiffs cite the affidavit of Austin Police Chief Art Acevedo ("Acevedo"). Acevedo states he considers both the current, newest Mexican matricula and its 2012 predecessor to be "a completely safe and secure identity document" which his department accepts routinely and considers "to be as safe and secure as a Texas driver's license." (Plf. Reply Decl. of Acevedo ¶¶ 7-8). Acevedo additionally notes he is familiar with practices of other police departments in the area, and they also use and accept the matricula as a safe and secure form of identity. (*Id*. ¶ 11).

Plaintiffs' evidence concerning recent upgrades to the Mexican matricula does indicate Defendants' concern regarding the ability to fabricate or readily tamper with the document may well be outdated. However, the evidence does not directly address Defendants' concern regarding the reliability or authenticity of the document. The Mexican consul general broadly testifies that, to obtain a consular identification card, a person must go to a Mexican Consulate and show original documentation establishing proof of Mexican nationality, official proof of identity, from either Mexico or the United States, and proof of address within the consular district. (Plf. Reply Aff. of Gonzalez Gutierrez ¶ 30). But Plaintiffs have not explained what documents are necessary to meet those requirements. Nor have they directly addressed whether a person can present those documents at different consulates and obtain multiple Mexican matricula. Nor, significantly, have Plaintiffs presented any evidence rebutting or otherwise casting doubt on the legitimacy of Defendants' concern regarding authenticity and reliability of passports lacking visas.

Although Plaintiffs do not directly address the issue, the Court notes Section 181 permits acceptance of other forms of "Foreign Identification" with an identifiable photo other than the matricula. Similarly, the policy allows other forms of secondary identification, such as a current student identification or a medical insurance card. The singling out of the Mexican matricula may

suggest it is being subjected to a different, and more exacting, standard than other forms of identification. Such treatment could lead to the conclusion that Section 181, and the Local Registrar Handbook, are implementing an underinclusive policy which would violate strict scrutiny.

Unfortunately, Plaintiffs have failed to present any evidence which would support such a conclusion. While a review of the secondary identification documents listed in Section 181 might cause the reviewer to question the relative reliability and ease of obtaining the documents as contrasted with the matricula and foreign passport without a visa, Plaintiffs have presented no evidence which would substantiate those questions. Wholly absent from the record is evidence which would confirm such documents are less reliable than the matricula and passport, or that the documents can be obtained with only minimal, or at least a lesser showing of identification, than the excluded matricula and foreign passport without visa.

In contrast, Defendants have presented evidence that a workgroup was commissioned by the 2011 Texas Legislature to develop recommendations to improve the security and effectiveness of the state's birth registration system. The workgroup consisted of staff from the Governor's office, the U.S. Department of Homeland Security, the U.S. Department of State, local registrars, and other local, state, and federal agencies. (Def. Resp. Decl. of Farinelli ¶ 7). The workgroup recommended that DSHS "consider amending administrative rule [25 TAC Section 181.1(13)] to strengthen the controls related to the identification required to issue a birth certificate." (*Id.*). Specifically, the workgroup recommended reducing the number of forms of acceptable identification to reduce the state's exposure to the presentation of fraudulent documents. The current regulation was adopted in response to the workgroup's recommendations. (*Id.*).

Defendants suggest that they are stuck between a rock and hard place: they have crafted what they believe to be an inclusive policy so that birth certificates are reasonably available to the appropriate parties, but Plaintiffs are now using the policy's generally inclusive character against

them to challenge its restrictive components.  A regulatory scheme "will not satisfy strict scrutiny if there is a less restrictive means that would be at least as effective in achieving the legitimate purpose that is being served."  *Service Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Reno v. ACLU*, 521 U.S. 844, 874 (1997)) (internal quotation marks omitted).  At the same time, "there simply has to be some room for judgment about how wide to cast the net."  *Republican Party*, 416 F.3d at 783.

While the Court is very troubled at the prospect of Texas-born children, and their parents, being denied issuance of a birth certificate, as the evidence presented by Plaintiffs themselves establishes, a birth certificate is a vital and important document.  As such, Texas has a clear interest in protecting access to that document.  Defendants have presented substantial evidence which suggests they have attempted to vindicate both interests.  Specifically, they have provided evidence which substantiates other governmental agencies, including the FBI, the Department of Justice and United States Immigration and Custom Enforcement, have expressed concerns regarding the reliability of the matricula.  Although Plaintiffs maintain that at least some of that evidence is outdated or otherwise questionable, the Court does not presently have a record which permits resolution of that challenge.  Moreover, as noted above, Plaintiffs have not presented any evidence which suggests Defendants have improperly focused on and excluded the matricula and foreign passport without visa as forms of secondary identification.

The Court must always keep in mind that "[t]he purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."  *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971).  For this reason, mandatory preliminary relief, such as that sought here, "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law *clearly favor* the moving

party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (emphasis added).  And, at this preliminary stage, it is the Plaintiffs who bear the "heavy burden of persuading the district court that all four elements are satisfied" and if they do not succeed, "a preliminary injunction may not issue." *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

In sum, the arguments of Plaintiffs, while heartfelt, compelling and persuasive, are not enough without substantiating evidence to carry the burden necessary to grant relief to Plaintiffs at this early stage of the proceedings. This is an important and difficult case which merits full factual development and a thorough presentation of evidence, which are both lacking at this stage. The Court thus concludes the state of the record at this preliminary stage falls short of sufficiently establishing that Plaintiffs are substantially likely to succeed on the merits of their constitutional claims.

### 2. Preemption

Plaintiffs have also alleged that the conduct of Defendants implicates a variety of preemption doctrines in violation of the Supremacy Clause.  The focus of their argument is that immigration law is a matter wholly reserved to the federal government.  More specifically, Plaintiffs allege that the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, along with developments in federal immigration regulation, preempt Defendants' restrictions on access to the Plaintiff children's birth certificates.

Plaintiffs raise three arguments in support of their claim. First, Plaintiffs argue that, by effectively curtailing the Plaintiff children's access to birth certificates, Defendants deny their rights, privileges, and immunities as citizens in conflict with the federal laws and the Constitution. Second, Plaintiffs contend that, by curtailing access to birth certificates, Defendants render life in the United States so intolerable that Plaintiffs are pushed to "self deport."  According to Plaintiffs,

such conduct intrudes upon the federal government's exclusive power to determine who may stay in the United States and who must leave, and conflicts with Congressional objectives.  Finally, Plaintiffs argue that Defendants' restrictions on access to birth certificates are a state sanction on undocumented immigrants.  They maintain such punishment is impermissible because the federal government, and not the states, determines the "rights and sanctions" available to or imposed upon immigrants.

It is a "fundamental principle of the Constitution [] that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see also* U.S. CONST. art. VI, cl. 2 (stating federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding").  Preemption takes different forms.  In addition to expressly preempting state and local law, Congress can preempt states from passing laws in regulatory "field[s]" that it determines "must be regulated by its exclusive governance."  *Arizona v. United States*, 133 S. Ct. 2492, 2501 (2012).  The determination is reflected by "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Id.* (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Congress may also preempt state laws that conflict with - or pose an obstacle to the purposes of - federal law.  *Id.*  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Id.* (quoting *Crosby*, 530 U.S. at 372).

The federal preemption power is particularly strong with regard to immigration regulation.  "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."  *Id.* at 2498.  A state may regulate noncitizens without

23

running afoul of federal supremacy.  *See De Canas v. Bica*, 424 U.S. 351, 355 (1976); *LeClerc v. Webb*, 419 F. 3d 405, 423 (5th Cir. 2005).  However, "[a]s the Supreme Court has emphasized - and indeed, as a constitutional imperative - a country's treatment of noncitizens within its borders can gravely affect foreign relations." *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 526 (2013); *see also Arizona*, 132 S. Ct. at 2498-99 ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States.").

Defendants challenge Plaintiffs' preemption claims with a call for specificity.  That is, they point out Plaintiffs neither specifically define the "field" preempted, nor identify the Congressional act or statute with which Defendants' policies conflict.  The "field," as Defendants characterize it, is "to whom and upon what showing the State should issue a certified copy of a birth certificate." (Def. Resp. at 24).  Against that definitional backdrop, Plaintiffs' argument has no traction.  Such a determination would seem to fall directly into a state's police power.  *E.g. Gonzales v. Oregon*, 546 U.S. 243,270 (2006) (noting regulation of health and safety is primarily a state's concern).  More broadly still, if the field is "the validity of foreign-issued identification documents," Plaintiffs' argument crashes against the reality that, as noted above, governmental agencies within the United States variously recognize (or decline to recognize) different forms of foreign identification.

Plaintiffs, in turn, respond that Defendants consider preemption too narrowly.  They point out, correctly, that Defendants' reliance on the Supreme Court's decision in *De Canas* and the Fifth Circuit's decision in *Le Clerc* glosses over a proliferation of federal immigration regulation and developments in preemption jurisprudence as it relates to immigration.  Both the Fifth Circuit and the Supreme Court have noted that the line Defendants hope to draw - between regulating who enters and must leave a country and regulating how immigrants are treated - is a blurry one.  *See,*

*e.g., Arizona*, 132 S. Ct., at 2498-99; *Villas at Parkside*, 726 F. 3d, at 526.   Plaintiffs are also correct that federal preemption does not depend on a specific congressional act precluding narrowly-defined state conduct. Rather, the Supreme Court has clearly established that a federal regulatory scheme can be so pervasive that there is no room for state regulation, or that federal law can preempt state laws contrary to its purposes.

Even in light of these developments, the factual record currently before the Court does not support a substantial likelihood of success for Plaintiffs' preemption claims.   Plaintiffs' arguments trip on two hurdles.   First, Plaintiffs' citations supporting a more expansive view of immigration preemption are to cases in which state or local laws expressly targeted undocumented immigrants. In *Arizona v. United States*, the Supreme Court addressed an Arizona law which, among other things, authorized officers to arrest a person whom officers had probable cause to believe "ha[d] committed any public offense that ma[de] that person removable from the United States." 132 S. Ct. at 2498.   In *Villas at Parkside*, the Fifth Circuit addressed a municipal ordinance prohibiting undocumented immigrants from renting apartments or single-family residences.  726 F. 3d at 526. Thus, both the Arizona statute and municipal ordinance expressly determined rights and sanctions based on a person's immigration status.   This Court is not aware of, nor have Plaintiffs pointed to, any cases in which courts have looked beyond the face of the statute to find federal field or conflict preemption.

Second, even if Plaintiffs had cited to cases permitting this Court to look beyond the face of a statute in determining field or conflict preemption, they have not shown such an examination would succeed.   Simply put, Plaintiffs have not presented evidence which establishes an impermissible purpose by Defendants in promulgating section 191 of the Texas Health and Safety Code and Section 181.   In fact, the evidence establishes Defendants have a compelling governmental interest in regulating with care the process of accessing birth certificates.   Finally,

Plaintiffs have not shown an effect on undocumented immigrants as a class akin to the effect of the statute at issue in *Arizona v. United States* or the ordinance at issue in *Villas at Parkside*.

The Court thus concludes Plaintiffs have not presented evidence and argument which makes a prima facie showing they are likely to succeed on the merits of their preemption claims.

**C.      Balancing of Respective Interests**

The final two prongs of the preliminary injunction inquiry require weighing of the respective interests of the parties and the public.  Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and  that the injunction will not disserve the public interest.  In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public from injury.

Because the Court has concluded Plaintiffs have failed, at this preliminary stage, to meet their burden of showing a substantial likelihood of success on the merits, the Court need not address this issue.

## IV.  CONCLUSION

In summary, although the Plaintiffs have provided evidence which raises grave concerns regarding the treatment of citizen children born to immigrant parents, this case requires additional determinations which can be made only upon development and presentation of an evidentiary record which thoroughly explores the facts and circumstances of the issues raised in this case.

Accordingly, Plaintiffs' Emergency Application for Temporary Injunction (Clerk's Dkt. #25)

is hereby **DENIED**.

      **SIGNED** on October 16, 2015.

ROBERT L. PITMAN
UNITED STATES DISTRICT JUDGE